## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

CENTA SCHULTZ and
CHARLES SCHULTZ, husband
and wife,

      Plaintiffs,

      vs.                                No. 08-CV-1182 WJ/GBW

THOMAS BYRNE, M.D.,
DEMING HOSPITAL CORPORATION, d/b/a
MIMBRES MEMORIAL HOSPITAL,
COMMUNITY HEALTH SYSTEMS, INC., and
COMMUNITY HEALTH SYSTEMS PROFESSIONAL
SERVICES, INC.

      Defendants.


## MEMORANDUM OPINION AND ORDER DENYING SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENCE CLAIM, AND GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES

THIS MATTER comes before the Court upon Defendant Byrne's Motion for Partial

Summary Judgment, filed March 25, 2010 (**Doc. 107**).  Having considered the parties' briefs and

the applicable law, I find that Defendant's motion is not well-taken and will be denied on the

merits of Plaintiff's claims, but that the motion is well-taken with regard to Plaintiff's claim for

punitive damages.

### Background

This is a medical malpractice case, filed in federal court based on diversity jurisdiction.

Defendant Thomas Byrne, M.D. ("Dr. Byrne" or "Defendant" for purposes of this motion) is a

licensed physician who practices medicine in Luna County, New Mexico and specializes in

obstetrics-gynecology.  The Complaint alleges that Plaintiff Centa Schultz suffered serious and disabling injuries as a result of laparascopic surgery performed by Dr. Byrne on April 27, 2007 at Mimbres Memorial Hospital in Deming, New Mexico.[1]  During the surgery, Dr. Byrne allegedly damaged Mrs. Schultz' colon.  While hospitalized, Ms. Schultz began to demonstrate signs and symptoms of serious post-surgical complications which suggested a bowel perforation.

Plaintiff alleges that Dr. Byrne was negligent and the care he provided to Mrs. Schultz fell below the standard of care required, and that as a direct and proximate result of the negligence of Dr. Byrne, Mrs. Schultz suffered serious and disabling injuries and other damages.[2]  Plaintiff seeks both compensatory and punitive damages.

I.       **Undisputed Facts**

A.       General Facts[3]

Dr. Byrne saw Mrs. Schultz for the first time on April 17, 2007. As of April 17, 2007, Mrs. Schultz had already had two or three open surgical procedures.[4] On April 17, 2007, Dr. Byrne performed an ultrasound on Mrs. Schultz. Parties agree that the left ovary was enlarged by

---

[1]  Centa Schultz' husband, Charles Schultz, is also a plaintiff in this suit, but the Court will refer to Centa Schultz as the Plaintiff in this Opinion for easier reading.

[2]  Neither the Complaint nor the Joint Status Report provides any detail or description of Plaintiff's injuries.

[3]  The facts included herein are supported by exhibits attached to the pleadings.  These facts are undisputed unless otherwise noted.

[4]  Many of Plaintiff's "disputes" of fact are not material.  For instance, Plaintiff disputes Defendant's statement of fact #2, which states that Mrs. Schultz had already had three open surgical procedures, arguing that the hysterectomy and bladder suspension she had in 1989 should be counted as one open procedure instead of two.  If her past medical history is relevant, it does not appear to be critical whether Mrs. Schultz had two or three procedures prior to seeing Dr. Byrne for the underlying procedure which forms the basis of this lawsuit.

at least 1.5 times the normal size, but disagree about the exact size of the enlargement. From a review of the ultrasound, Dr. Byrne believed that Mrs. Schultz' left ovary contained a "complex cyst." Plaintiff does not dispute Dr. Byrne's conclusion on review of the ultrasound, but rather disputes whether a finding of a "complex cyst" based on one ultrasound was enough to decide to send Mrs. Schultz to surgery, and in doing so, suggest that Dr. Byrne's description of the cyst as complex rather than simple was an incorrect interpretation of the ultrasound.

On April 17, 2007, Dr. Byrne scheduled Mrs. Schultz for laparascopic surgery. Defendant states that the purpose of the surgery was to rule out ovarian cancer, but Plaintiff notes that Dr. Byrne's Operative Report (Ex. D) does not mention cancer, and that Dr. Byrne noted that cancer was unlikely in his history and physical notes.  Plaintiff concedes that Mrs. Schultz agreed to having eploratory surgery to evaluate whether there was a possibility of cancer, but explains that she did so only because Defendant "raised the specter of cancer." Pltff's Resp. to Statement of Facts, No. 9.

During the surgery on April 27, 2007, Dr. Byrne removed the cyst (Plaintiff clarifies that it was the ovary, rather than simply the cyst, that was removed), and the pathology report indicated Mrs. Schultz had benign follicular cysts and a serous cystadenofibroma, which is a benign tumor of the ovary.  Dr. Byrne elected to keep Mrs. Schultz in the hospital for observation instead of releasing her to return home because of the possibility of complications which might follow a laparoscopy.

The day following surgery (April 28, 2007), Dr. Byrne was worried that Mrs. Schultz had a bowel injury, and elected to consult with Dr. Mehta, a general surgeon, regarding Mrs. Schultz' condition.  Dr. Byrne continued to see Mrs. Schultz on April 29, 2007 (checking vitals signs, lungs, bowel sounds and ordering complete blood count and complete metabolic profile); and

again on April 30, 2007 (assessing extremities, checking vital signs, lungs and bowel sounds; examining abdomen); on May 1, 2007 (checking vital signs, bowel sounds and surgical incisions; and examining abdomen), and May 2, 2007 (checking vital signs and bowel sounds; and examining abdomen and incisions).

Dr. Mehta saw Mrs. Schultz in her hospital room on the evening of April 28, the morning of April 29, and the morning and evening of April 30, 2007.  He ordered a CT-scan of Mrs. Schultz' abdomen on April 30, 2007, and reviewed the results with the radiologist on May 1, 2007.  Dr. Mehta was concerned about a fistula, but did not recommend surgery.  It is undisputed that Dr. Byrne cannot perform surgery to repair a bowel perforation, but parties disagree about whether Dr. Byrne or Dr. Mehta would have been in charge of deciding whether to take Ms. Schultz to surgery.  In any case, on May 2, 2007, Dr. Mehta recommended to Dr. Byrne that Mrs. Schultz be transferred to Tucson, Arizona.  Mrs. Schultz was transferred to Tucson on May 3, where her bowel was subsequently repaired.

B.     Facts Relating to Opinions and Statements of Plaintiff's Liability Expert

Defendant's position in the instant motion is that Dr. Alan Johns, Plaintiff's liability expert,[5] cannot support Plaintiff's claims of negligence against Dr. Byrne.

II.     **Legal Standards**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Atlantic Richfield Co. v Farm Credit*

---

[5] The Joint Status Report identifies Dr. Johns as "D. Alan Johns, M.D."  Doc. 38 at 22.

*Bank of Wichita*, 226 F.3d 1138 (10th Cir. 2000).  Summary judgment is not appropriate if disputes remain as to material facts.  *Id.*

In order to establish a claim of medical negligence against Defendant Byrne, Plaintiff must show that: (1) Dr. Byrne owed a duty of care to Plaintiffs; (2) that he breached that duty by departing from the appropriate standard of care; and (3) that Dr. Byrne's breach was the proximate cause of injury to Mrs. Schultz.  *Blauwkamp v. Univ. of New Mexico Hosp.*, 836 P.2d 1249, 1252 (N.M. Ct. App. 1992).  In medical negligence actions, the elements are usually proven through expert testimony because the issues raised are often beyond the understanding of an ordinary lay person.  *Alberts v. Schultz*, 975 P.2d 1279, 1284 (N.M. 1999).[6]  Evidence based on such testimony must show to a reasonable degree of medical probability that the defendant's negligence caused plaintiff's alleged damages. *See Alberts v. Schultz, M.D.*, 975 P.2d 1279, 1284 (N.M. 1999).  In other words, when "proving causation, the plaintiff must introduce evidence that the injury more likely than not was proximately caused by the act of negligence." *Id.* at 1286.  Plaintiff argues that Dr. Byrne was negligent by (1) injuring her bowel in the course of the laparascopic surgery performed and (2) by failing to conduct additional pre-surgical work-up before deciding to perform the procedure on Mrs. Schultz.

### Discussion

Plaintiff's claims arise from allegations that (1) Dr. Byrne negligently failed to conduct

---

[6]  In most medical malpractice cases, expert medical testimony "must be adduced to establish a standard of care, to assess the doctor's performance in light of the standard, and to prove causation." *Gerety v. Demers*, 589 P.2d 180, 191 (N.M., 1978); *Alberts*, 975 P.2d at 1286 ("In order to dispel the potential for any confusion, we emphasize that the standard in New Mexico is proof to a reasonable degree of medical probability."); *Romero v. State*, 814 P.2d 1019, 1028 (N.M.App.,1991) (in medical malpractice case, questions of doctor's negligence and causation ordinarily must be proved by expert testimony) (citation omitted).

additional pre-operative testing; and (2) Dr. Byrne negligently caused injury to Mrs. Schultz.

Dr. Byrne further requests summary judgment on Plaintiff's claims for punitive damages.[7]

## I.        Breach of Legal Duty

Plaintiff's claim of operative negligence is based on the contention that Mrs. Schultz

should not have been taken to the operating room in April 2007 in the first place, contending that

Mrs. Schultz was unnecessarily rushed to surgery because of Dr. Byrne's inadequate work-up

and incomplete evaluation of the cyst.  Plaintiff's alleged breach of legal duty regarding

operative negligence appears to be premised on a breach of the standard of care relative to the

pre-surgical work-up and evaluation.

Dr. Johns stated in his affidavit that Dr. Byrne deviated from the standard of care in Mrs.

Schultz' preoperative evaluation, during the surgery when he perforated the bowel, and also in

her postoperative care.  His opinion regarding Dr. Byrne's level of care during the surgery is

based on his review of Dr. Byrne's operative note.  The note (Ex. D) referred to Dr. Byrne's

"cauterizing" the uterosacral ligament in order to remove the ovary.  Dr. Johns felt that this note

showed Dr. Byrne's "lack of knowledge of female pelvic anatomy" because the uterosacral

ligament does not attach to the ovary.  Ex. F, ¶8.  Dr. Johns also opined that the postoperative

care rendered by Dr. Byrne fell below an acceptable standard because Dr. Byrne essentially

ignored Mrs. Schultz' signs and symptoms of a postoperative bowel perforation for six days after

her surgery.  Ex. F, ¶ 12.

Defendant contends that Plaintiff cannot prove that a lack of pre-surgical work-up by Dr.

---

[7]  The Complaint appears to allege that Dr. Byrne was negligent in his post-operative care
of Mrs. Schultz.  Compl., ¶¶ 17-18.  Defendant's motion does not address Plaintiff's claim under
that theory.

Byrne was a proximate cause of any injury to Mrs. Schultz.  Dr. Johns found fault with Dr.

Byrne's pre-surgical work-up in two areas: (1) in Dr. Byrne's description and evaluation of the

cyst from the ultrasound, and (2) in additional  preoperative work-up which should have been

done.  Ex. F.  The parties agree that bowel injuries are known risks of laparascopic surgery.

However, Defendant concedes that for purposes of this motion, genuine issues of material of fact

exist as to whether the applicable standard of care would require a reasonable surgeon to perform

additional pre-surgical work-up before performing the laparoscopy.  Mot. at 10.

A.      Description of Cyst

        Based on a review of the ultrasound of Mrs. Schultz' left ovary, Dr. Byrne determined

that the ovary measured 46 by 37 by 41 millimeters, at least 1.5 times the measurement of a

normal ovary, and that it contained a single complex cyst. Ex. 1 (Byrne Dep.) at 42:14-17.  Dr.

Byrne's position is that he scheduled Mrs. Schultz for surgery in order to rule out a malignancy.

Plaintiff contends that Dr. Byrne did not schedule her for surgery to rule out cancer, but the

Court agrees with Defendant that Plaintiff offers no material fact which would raise a question

concerning the ostensible purpose of the laparoscopy. While the operative report does not

mention cancer, the medical history and the physical examination makes it clear that the purpose

of the surgery was to rule out cancer, even though Dr. Byrne noted that cancer is "unlikely." Ex.

B at 35:19-20; Ex. E (History & Physical dated April 26, 2007). Dr. Byrne explained why he

scheduled Mrs. Schultz for surgery even though he thought cancer was unlikely:

Q:      . . . you didn't think that Ms. Schultz had cancer, did you, in her ovary?

A.      I didn't – I thought that this was benign, but I couldn't prove it was benign.

Q.      So it's important to – why is it important to prove that it isn't benign?

A.      Well, if you – if I told you there's only a 15 percent chance you have cancer, so we'll just

wait on it, would you be happy with that answer? . . .

Ex. C at 44:9-18.  The Court finds it undisputed that the purpose of the surgery was to rule out ovarian cancer.  The question is whether there is a material dispute regarding whether Dr. Byrne's decision to proceed with surgery was below the acceptable standard of care and ultimately whether that decision, to a reasonable degree of medical probability, caused Mrs. Schultz' injury.

According to both Dr. Byrne and Dr. Johns, a "complex cyst" can be either benign or potentially malignant.  Dr. Byrne described a simple cyst as having "regular, smooth walls" where a complex cyst would have "irregular walls" or there would be "solid areas in between the cystic area.").  Ex. 1 at 42:18-25; 43:1-6.  Dr. Johns stated that a simple cyst is generally "thin-walled" with only one component or cyst, and without any septations.[8]  Ex. B at 6:1-7.  He explained that a "complex cyst" can mean a "number of things from something that's benign to something that is potentially malignant" and that a description of a cyst as "complex" means "potentially nothing more than a simple septation within the cyst that's thin-walled" (Ex. B at 7:6-8;10-13).  Dr. Tom Stafford, the defense medical expert, also stated that a complex cyst likely raised Dr. Byrne's concern about malignancy.  Ex. H at 27:21-23.[9]

Dr. Johns testified that the pathologist's examination disagreed with Dr.Byrne's conclusion that the cyst was "complex," reporting instead a "simple cyst" - a cyst with an inner

---

[8] The Merriam-Webster Online Dictionary defines a "septation" as a division into parts by a "septum" which is a dividing wall or membrane especially between bodily spaces or masses of soft tissue.

[9] Plaintiff refers to Dr. Stafford as "Defendant's ob/gyn expert."  Doc. 119 at 9. However, neither Defendant's motion or reply mentions Dr. Stafford or offers any of his deposition testimony, nor is he mentioned as a potential witness in the Joint Status Report.  Doc. 38.

wall that was "smooth with no papillary excrescences or other tumor masses." Ex. B at 9:12.  Dr. Byrne's description of the cyst in the operative report also differed from his initial conclusion, stating that the ovary contained "several simple cysts." Ex. D.

Dr. Johns could not say to a reasonable degree of medical probability that Dr. Byrne's description of the cyst was incorrect when he identified the cyst as complex rather than simple. He stated that it was "quite possible" Mrs. Schultz may not have gone to surgery at all if she had a second ultrasound a month after the first one, and if there no change observed in the cyst.  Ex. B at 54:20-25; 55:1-10.  However, Dr. Johns attributed his inability to make that conclusion to the inadequacy of the records, including ultrasound images, from which he could discern whether Dr. Byrne's measurements were accurate, detailing the appearance of the cyst.  Ex. 2 at 7:3-6; 7:24-25; Ex. B at 55:7-10.  Dr. Johns stated that while the size of the cyst is a factor (the cyst would need to be 3 to 4 centimeters minimum), the size is not as critical as the characteristics of the cyst.  Information as to the wall thickness, the number of septations and further characteristics of the septations, would help determine whether the cyst was suspicious for cancer.  Ex. B at 10:2-16.  Dr. Byrne's records contained no information regarding the appearance of the cyst other than "complex," which made it near impossible to determine the degree of accuracy of Dr. Byrne's evaluation of the cyst, and in turn, whether further work-up would have obviated the need for surgery and the subsequent injury.  Ex. B at 7:2-8; at 9:21-25; 10:1-15.  Dr. Johns opined that Dr. Byrne's preoperative work-up, as well as records regarding his work-up, was inadequate and meaningless in terms of making a decision for surgery.  Ex. B at 5:20-24; 6:17-21; 8:1-3; Ex. F, ¶ 5).

There were no findings on Dr. Byrne's ultrasound report regarding the ovarian mass' wall thickness, septations, density, excrescences, vascularity or any need for doppler ultrasound

imaging. (Ex. B, Johns deposition, page 7, line 22 through page 8, line 17.)  Nor did Dr. Byrne

make any statements in any of his deposition testimony which gave a more detailed description

of the cyst which he concluded was a "single complex cyst."[10]

B.      Pre-Surgical Work-Up

Dr. Johns opined that Dr. Byrne's preoperative care of Mrs. Schultz was below the

standard of care in several aspects.  He noted that because Mrs. Schultz was a "high-risk

patient," Dr. Byrne should have carried out a more thorough pre-operative evaluation.[11]  This

evaluation should have included doppler testing in order to obtain more information about the

cyst – such as thickness of the walls, whether there were walls within the cyst ("septated"), and

what material, if any, was inside the cyst.  Dr. Johns opined that this "rush to surgery" caused

Plaintiff's bowel injury and the subsequent multiple surgeries to repair the injury in Tucson.  Ex.

5, ¶ 5.  Dr. Johns also stated that if Dr. Byrne actually suspected ovarian cancer, he should have

been prepared to proceed with a cancer operation if needed during the exploratory procedure.

For example, there should have been tumor markers, blood work, a bowel prep and peritoneal

washings, a surgeon on standby, and a pathologist to determine whether the cyst was cancerous.

---

[10]      In the response, Plaintiff notes that Dr. Byrne testified that he only includes
significant findings in his records; if he did not record something that means there was not a
positive finding. Doc. 119 at 8 and n.1.  In offering this testimony, Plaintiff refers to several
portions of "Ex. 11, Byrne/Fairres case deposition."  However, Plaintiff does not refer to a
specific docket number or otherwise describe the pleading to which that deposition may have
been attached as an exhibit.  The Court has reviewed over 140 docket entries in that case (Civ.
No. 08-1183 WP/ACT), and as best that can be determined, can find no deposition of Dr. Byrne
which contains the page numbers cited in the response for the present case.  Nor can the Court
find "Exhibit l1," "Exhibit 11," "Exhibit I1," or any other combination which would contain the
testimony cited in the response.


[11]  It is not clear from the briefs exactly why Mrs. Schultz was considered a high-risk
patient.

Ex. F, ¶ 8.  Dr. Johns explained that a patient's bowels should be emptied before going into an

operation for ovarian cancer, because "you never know if you're going to have to take out a loop

of bowel or not."  Ex. B at 12:8-12.  He also stated that when a surgeon is operating with the

possible diagnosis of cancer, the standard of care requires him to do a peritoneal wash before any

part of the surgery has started in order to test the peritoneum for the presence of cancer cells.

(Ex. F, Johns Aff., ¶ 9.)  Dr. Byrne himself agreed that peritoneal washing is used to detect

cancer cells. (Ex. C at 79:20; 80:1-7.)

       Dr.  Johns espoused a "wait and see" approach for at least a few weeks in non-emergent

situations.  He recommended that Dr. Byrne should have done additional work-up (such as blood

work and another ultrasound) prior to the laparoscopy, in order to see if the cyst changed in any

way over time.  Ex. B at 10:10-11, 2-21.  In his opinion, Mrs. Schultz' condition was not an

"emergent situation because it's very common to look at an ovary and see something and look a

week or two weeks later and you don't see the same thing." Ex. B at 41:4-19.

       As expected, Dr. Stafford opined that waiting does not necessarily determine whether

surgery is needed.  He stated that he frequently took non-emergent patients to surgery for the

removal of a complex ovarian cyst after seeing them for about 30 minutes. Ex. H at 72:5-11.

However, he also stated that he followed a "wait and see" approach with some of his patients

who "don't want to go to surgery" and that none of them have developed cancer in his 35 years

of practice.  Ex. H at 72:12-25.

C.    <u>Postoperative Care</u>

       Plaintiff's rather generic complaint does not specifically allege medical negligence in Dr.

Byrne's postoperative care.  However, the response to Defendant's motion for summary

judgment suggests such a claim.  Doc. 119 at 13.  Based on the statements of Dr. Johns, Plaintiff

contends that over the first few days following surgery, Mrs. Schultz first starting showing signs and symptoms of a possible bowel injury, such as signs of dehydration and decreased urine output.  A CT scan of her pelvis which was not ordered til 3rd postoperative day confirmed the possibility of bowel injury, but she was not transferred to the University Medical Center in Tucson until six days after surgery. Ex. F (Johns Aff.), ¶¶ 12-14.

The merits of this part of Plaintiff's claim – if indeed it is alleged – is doubtful.  The parties do not dispute that Dr. Byrne kept Plaintiff in the hospital for observation following surgery; and that he suspected a bowel injury and requested the services of Dr. Mehta, a board certified surgeon, to determine whether a bowel injury existed and the appropriate treatment for the same.  *See Undisputed Fact No. 12.*  Neither do parties dispute that Dr. Byrne continued to treat, test, and examine Mrs. Schultz while a patient at Mimbres Memorial Hospital. Nevertheless, Dr. Johns states in his affidavit that "nothing was done" to resolve Mrs. Schultz' postoperative complications until six days after her surgery, suggesting that the postoperative treatment was negligent in that it was not fast enough.

D.      Conclusions Regarding First Two Elements of Negligence Claim

Based on Dr. Johns' statements in his deposition affidavit, factual issues exist regarding whether Dr. Byrne breached an acceptable standard of care in preoperative care of Mrs. Schultz, both in his evaluation of the cyst, and in doing additional work-up prior to the surgery.  Thus, the evidence presented by Plaintiff in the form of expert testimony is sufficient to preclude summary judgment on the first two elements of Plaintiff's medical malpractice claim: that Dr. Byrne owed a duty of care to Plaintiffs and that he breached that duty by departing from the appropriate standard of care.  *See Blauwkamp*, 836 P.2d 1249, 1252 (N.M.App.,1992) (defendant seeking summary judgment in medical malpractice action bears initial burden of negating at least one of

12

the essential elements upon which plaintiff's claims are grounded).

## II.    Causation

The final and critical question is whether Dr. Byrne's breach (about which there are disputed factual issues) in either or both of these areas caused Mrs. Schultz' bowel perforation. Under New Mexico law, "proximate cause" of an injury is

> that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury.

*Alberts v. Schultz*, 975 P.2d at 1286.

In his deposition, Dr. Johns could not definitively state to a reasonable medical probability that Dr. Byrne was negligent in causing the injury to Mrs. Schultz' bowel.  Ex. 2 at 15:2-9.  Neither could Dr. Johns state to a reasonable degree of medical probability that if additional work-up had been done, no reasonable surgeon would have proceeded with surgery to rule out the possibility of cancer. Ex. 2 at 54:20-25; 55:1-25.  Without expert testimony to establish causation, Defendant would be entitled to summary judgment.

However, four months after his deposition was taken, Dr. Johns made statements in an affidavit which are exactly opposite from his earlier statements:

> The medical care and treatment Mrs. Schultz received at University Medical Center in Tucson beginning may 3, 2007 was reasonable and necessary.  As a matter of reasonable medical probability, this case was the direct result of Dr. Byrne's deviation from the standard of care during her preoperative evaluation, intra operative [sic] care, and postoperative care rendered by Dr. Byrne.

Ex. F, ¶ 14.

These statements are inconsistent with Dr. Johns' deposition statements concerning whether Dr. Byrne's deviation from the standard of care was the cause of Plaintiff's injury. The

13

reasons, if any, for Dr. Johns' change of mind cannot be ascertained from any of his affidvit statements. The Court may not determine whether Dr. Johns' later statements in his affidavit are more credible than his previous deposition statements. *See Bisbee v. Bey*, 39 F.3d 1096, 1101 (10th Cir. 1994) (questions of credibility should be decided by the jury). At trial, defense counsel will have the opportunity to cross-examine Dr. Johns and ask him to explain this inconsistency, and if necessary, move the Court to direct a verdict on the issue of causation. For now, Dr. Johns' affidavit statements are sufficient to preclude summary judgment on Plaintiff's claims against Dr. Byrne.

**III.    Punitive Damages**

In addition to their claims of negligence, Plaintiffs allege that Dr. Byrne's conduct was willful, wanton, or reckless, subjecting him to liability for punitive damages. Recovery of punitive damages is allowable only if there is a finding that the defendant's conduct is malicious, willful, reckless, wanton, fraudulent or in bad faith. *See Eckhardt v. Charter Hosp. v. Albuquerque, Inc,* 953 P.2d 722, 736 (Ct. App. 1997); *see also* NMRA, UJI 13-1827 (2003). A punitive damages award must be based upon an "evil motive" or "culpable mental state" involving a "conscious and deliberate disregard of the interests of others." *Id.* "mere negligence or inadvertence is not sufficient to support an award of punitive damages." *Clay v. Ferrellgas, Inc.*, 881 P.2d 11, 14 (N.M. 1994); *Gonzales v. Sansoy*, 703 P.2d 904, 907 (N.M. Ct. App. 1984)

This case has all the earmarks of a negligence claim, and only a negligence claim. There is no evidence of utter indifference or conscious disregard on Dr. Byrne's part – either before, during or following the laparoscopy. There is no evidence that Dr. Byrne was consciously aware of the wrongfulness or harmfulness of his conduct and yet continued to act in ways that he knew would result in injury to Mrs. Schultz. *See, e.g.,Gonzales v. Sansoy,* 703 P.2d 904, 907 (Ct. App.

14

1984) (noting that there was no suggestion that the defendant's mis-diagnosis was a result of reckless conduct or utter indifference to the patient where physician treated for ulcer and sent home but plaintiff later discovered to have ruptured appendix requiring surgery).  As a result, the Defendant is entitled to summary judgment on Plaintiff's claim for punitive damages.

### Conclusion

In sum, I find and conclude that the record demonstrates the existence of a material dispute of fact with regard to whether Dr. Byrne deviated from an acceptable standard in his care of Mrs. Schultz, prior to surgery, during surgery and postoperatively. In that regard, summary judgment is denied as to the first two elements of Plaintiff's claim.

Plaintiff has provided sufficient evidence in the form of expert testimony with regard to whether Dr. Byrne's alleged negligence was the proximate cause of her injury.

Finally, the Court finds and concludes that Plaintiff has not shown evidence which suggests a basis for punitive damages.

**THEREFORE**, for the reasons stated in this Memorandum Opinion and Order,

**IT IS ORDERED** that Defendant Byrne's Motion for Partial Summary Judgment (**Doc. 107**) is hereby DENIED except that the Court grants Defendant's Motion for Partial Summary Judgment on Plaintiff's claim for punitive damages.

_____
UNITED STATES DISTRICT JUDGE

15